UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DON VAN CAMP,

      Plaintiff,

vs.                                          CIV 99-1464 KBM/DJS – ACE

UNITED STATES DEPARTMENT
OF AGRICULTURE FOREST SERVICE,

      Defendant.

## **MEMORANDUM OPINION AND ORDER**

Pursuant to a 1995 special use permit, Plaintiff Don Van Camp ("Van Camp") operates a boat dock and concession area on Luna Lake in Arizona. He appeals the Forest Supervisor's decision revoking permission for him to reside on the premises and subsequent affirmance of that decision by the Defendant's Albuquerque Regional Office. Plaintiff contends that the decision was arbitrary and capricious under the Administrative Act, 5 U.S.C. § 701 *et seq.* The matter is before the Court on the administrative record and the briefs of the parties. *See Docs 10, 15-17.*

Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties consented to have me serve as the presiding judge and enter final judgment. Having reviewed the entire record, arguments of the parties, and relevant authorities, I find the administrative decision was neither arbitrary nor capricious and should be sustained.

## **I. Permit Terms**

In May 1995, Plaintiff was granted permission to "use . . . [a] boat dock and buildings located at Luna Lake . . . for the purpose of: [o]perating a high quality boat dock and boat rental service and operating a high quality concession service which would include but not be limited to selling fishing tackle, food, drink, grocery items, and firewood." *Admin. Record, Exh. 9* at 1.[1] The permit is also "subject to . . . conditions set out below," *id.,* one of which provides:

> 45.  IMPLIED PERMISSION (X3):  Nothing in this permit shall be construed to imply permission to build or maintain any structure not specifically named on the face of this permit, or approved by the authorized officer in the form of a new permit or permit amendment.

*Id.* at ¶ 45.  The permit requires that the permit holder "comply with the regulations of the Department of Agriculture and all Federal, State, County, and municipal laws, ordinances, or regulations."  *Id*. at ¶ 7.  Attached to the permit is a hand-drawn sketch of the premises showing a dock, storage shed, ice machine, store, propane tank, solar panels, walkway, parking lot and rock barriers.  *Id.* at Attachment.  The written special use permit does not specifically include residency as a permitted use of the premises.

The permit itself does not contain day-to-day operating requirements.  Instead, it requires the permit holder to annually prepare an operating plan, which becomes part of the permit upon approval by the Forest Service.  *Id.* at ¶ 56.  The 1995 operating plan provided that the dock/concession was to be open seven days a week in the summer and "in winter operation as the weather permits.  If the weather should make the road to the boat dock impassable, Van Camp will either close down operation until the weather is more favorable, or he will see to it that the

---

[1] Unless otherwise noted, all citations to exhibits are those contained in the certified Administrative Record and citations to documents are pleadings filed in this action.

road is maintained." *Exh. 8.* His May 1997 operating plan was the same, except that Van Camp chose to close down until the winter weather became more favorable rather than retaining the option to maintain the road. *Exh. 17.* Plaintiff was granted permission in March of that year to remove "beavers and muskrats from [the] concession area" either by trapping or by shooting the animals with a pellet rifle. *Exh. 14.* The operating plans, like the permit and sketch, also say nothing about Van Camp residing on the premises.

## II.  Conditional Permission To Reside On Premises

The Forest Service Manual section governing residency in a permit area provides:

> 2341.5 - Permittee Employee Housing.  Some special recreation uses, such as ski areas and year-round resorts, may require on-site housing for the permittee and/or employees of the permittee to adequately protect property and provide for public safety.  The authorized officer shall carefully evaluate the need and justification for permittees housing within a permit area and shall make the determination in compliance with the appropriate environmental analysis and documentation requirements set forth in FSM 1950 and FSH 1909.15.
>
> An authorized officer *may* approve permittee housing within a permit area if the following conditions are met:
>     1.  Provisions of permittee housing is consistent with the management direction and guidelines of the forest land and resource management plan for the area.
>     2.  There is a clear and convincing need for 24-hour, on site property protection, round-the-clock public safety, and/or intermittent emergency service at other than normal operating hours and the commuting time between the permit area and the nearest private property available for permittee housing exceeds one hour.

*Doc. 16* at Attachment (emphasis added); *see also Exh. 27;* www.fs.fed.us/im/directives/fsm.  It appears that Plaintiff has never disputed that the above Forest Service Manual section "was in effect" in 1995.  *Exh. 27-29.*

The previous permit holder, Fabian Deppe ("Deppe"), had a trailer on the site next to the store and sold it to Van Camp along with the improvements at the Luna Lake Boat Dock. *Exh. 50.* Apparently, even though Deppe had a residence elsewhere, he used the trailer to sleep in during the season when the dock and concession were in operation. *See Exh. 30; Exh. 20.* When Plaintiff purchased the new special use permit in January 1995, he asked Acting District Ranger Bob Dyson if he could stay in the trailer during the summer season as had Deppe. Ranger Dyson "gave [him] verbal permission" to do so. *Exh. 28.*

In Spring 1996, Ranger Dyson approached Van Camp and informed him that "technically [he] was not allowed to live on the site year round." *Exh. 43* at Attachment. Plaintiff expressed concern that he wanted to "watch over" his investment during the off-season because he had made a number of improvements and increased the concession inventory. Ranger Dyson "agreed and allowed [him] to stay." *Id.* Plaintiff did not maintain a separate residence elsewhere and used the trailer as his year-round residence. He did, however, buy a smaller "less conspicuous" trailer for his own use in the Spring 1997. *Id.*; *see also Exh. 20.*

In May 1997, Acting District Ranger Nancy Walls conducted an annual inspection of the premises. In her letter summarizing the visit, she noted six areas that needed attention. Points 4 and 6 concern Plaintiff living on the premises and provided in full:

> Your living quarters within the permit area were discussed. The existing location of your camp trailer is approved under the condition that no waste water or gray water is released at that location. Future development at this location may require that the trailer be moved to another location. We concur with your choice to paint the trailer the same color as the other buildings at your facility. Please include this project in your operating plan for this year.
>
> \* \* \* \* \*

> Sanitation within the store was also discussed. By selling drinks and snacks and frozen goods, you essentially are operating a very small grocery store, and the standards for sanitation should reflect that. I ask that you separate all of the grocery items from the tackle, baits and other non-grocery items and that the store is maintained in a clean and sanitary manner. Please position the grocery section away from your cat's eating and sleeping areas. Finally, it was discussed that it would be best to keep your personal groceries and living effects in your trailer and to keep your living quarters separate for (sic) the store.

*Exh. 16.* During the following annual inspection conducted by District Ranger Philip R. Settles in August 1998, many of the same deficiencies were noted including: continued co-mingling of Van Camp's personal items and groceries with the store facility; an open bottle of liquor visible behind the store counter, and lack of a professional image expected of a National Forest concession.

In a letter sent shortly thereafter, Ranger Settles again requested that Van Camp "keep you personal groceries and your personal items at your living quarters and separate from the store." *Exh. 19.* Ranger Settles also addressed the issue of Van Camp residing on-site:

> I can understand your need to live close to your permitted facilities during the busy summer fishing season, approximately May 1st -September 15th each year. However, I do not see the need to live on the site during the remainder of the year. Our goal in providing a boating/tackle concession at Luna Lake is to offer recreation opportunities to the public that otherwise would not exist. It has never been an objective to provide a full-time residence to the concessionaire. The site simply was not designed for that purpose. I do ask that you arrange for other off-season living accommodations by October 1, 1998. . . .
> I do feel that these requests are reasonable from a business standpoint, and that ultimately they will benefit the concession as well. If you have any questions or would like to discuss this further, please contact [Recreation and Lands Forester] Don Hoffman or me for an appointment.

5

*Exh. 19.* In response, on September 21, 1998, Plaintiff indicated that he was "not trying to create a permanent residence at Luna Lake" and was "not asking to be subsidized," that he was not discharging any wastewater because he showers, shaves, and does laundry in town, but that he did want to be able to stay on the premise all year to protect his investment. *Exh. 20.*

In his letter of October 6, 1998, Ranger Settles remained unconvinced that year round residence by Plaintiff was appropriate during the non-operational winter months:

> I understand that you feel that by residing at the concession year around you provide security for your investment. However, I believe that you could protect your investment through insurance coverage for vandalism and theft, and/or by reducing or removing your boats and stock at the end of the summer season. Historically, that is how other permit holders of this concession have operated.

*Exh. 21.*[2] The two met about a week later, at which time Van Camp was shown to the above Forest Service Manual section governing on-site residency. *See Exh. 27.* During this discussion, Plaintiff indicated that he "intended to upgrade [his] winter business." Ranger Settles agreed to consider a trial period to see "if there was adequate public demand which would fully support a

---

[2] Ranger Settles also discussed

> a few points that we addressed in our letter of August 10, following our inspection. . . . We asked that you remove the pontoon boat from the parking lot since you no longer rent it out. The last time we checked, it is still parked in the public parking area. Please remove it from the permit area by October 30th. Also, we did discuss the whisky bottle on the counter within the store. I now understand that it is unopened and that you display it because it is a valued gift that you received. However, we did discuss it at a personal visit I made to your store, and we agreed that it was not an appropriate display at the concession store, particularly since you are not licensed to sell liquor at the store. If you have not done so already, I do ask that you remove any liquor bottles from the store.

full-time winter business" and "to see if his concern of mixing . . . personal effects and living quarters with the retail store facility could be mitigated." *Id.*

Plaintiff then submitted a written "proposal of a study covering the period of 11/1/98 through 4/30/99," conditioned on seven items, one of which was him being permitted to stay in residence on-site through the winter while they assessed the amount of business at the dock during that time period.[3] *Exh. 22.* Plaintiff proposed that he be permitted "to live on premises under the conditions set forth" in Acting Ranger Wall's May 1997 letter. *Id.* By letter dated November 16, 1998, Ranger Settles accepted the "proposal to study the financial potential of maintaining a full time winter business," and wished Van Camp "good luck with [his] efforts." *Exh. 23.*

On December 3, 1998, however, Ranger Settles visited the marina. There he encountered two individuals drinking beer on the porch of the store.[4] *Exh. 24.* They were hostile and expressed a "very negative view of the Forest Service" to Ranger Settles as a result of the anger Plaintiff "apparently expressed" to them. *Id; see also Exh. 27.* Van Camp refused to speak with Ranger Settles, saying he would "only communicate [with the Forest Service] through his lawyer." *Exh. 24.*

In response to the events of that day, Ranger Settles wrote Plaintiff about his concerns with the encounter, asking that Plaintiff suggest "how to improve [their] line of communication." *Id.* The letter also noted that it is illegal to allow consumption of alcohol on the premises, asked

---

[3] Plaintiff agreed to remove the pontoon boat, store the other boats neatly, remove the whisky bottle, plow snow from the roads, and maintain a report of the number of persons using the facility and money receipts during the trial period. *Exh. 22.*

[4] It is not clear whether they were store customers or just friends of Van Camp.

Plaintiff to entertain his friends in his trailer, and reminded Plaintiff that as a permit holder he was a representative of the Forest Service. Ranger Settles concluded:

> The store is a place of business and not your personal residence. This topic has been documented in previous correspondence. Once again, I ask that you regulate activities at the store in a manner that is appropriate for a concession facility rather than a personal residence.

*Id.*

At the time Ranger Settles authored the above letter, he was apparently unaware that of an incident that had occurred on December 13,1998. A dog belonging to a neighbor and wearing a collar chased Plaintiff's cat. Plaintiff thought it might be one of the stray dogs that had recently chased elk onto the frozen lake, where one of the elk drowned despite Plaintiff's assistance to Forest Service personnel in attempting to rescue the animal. Using his pellet gun, Van Camp shot the dog in the rear end as it was leaving, which left a pellet lodged in the dog's rectum. The citizen who owned the dog complained to the police. *See Exhs. 25-28.*

The Forest Service investigated. During an interview, Plaintiff gave investigating officer Bobby Chavez the impression that the boat dock facility was his "personal place of residence rather than a public facility." *Exh. 26.* The officer concluded that Plaintiff reacted emotionally and was "protecting his 'personal space.'" Rather than shooting the animal, a shout may have served as a sufficient and "appropriate action from a forest service representative." Officer Chavez recommended that to "prevent future incidents involving personal biases . . . residency be relinquished from the permit. As it stands now the public could perceive the store as being personal property rather than a public facility." *Id.*

### III.  Decision to Revoke Permission To Reside In Permit Area

On January 21, 1999, Forest Supervisor John C. Bedell found that "Ranger Settles has made every reasonable attempt to accommodate [Van Camp's] request to reside on-site" but because of Plaintiff's "actions and nonresponsiveness, this has not worked." *Exh. 27.*  He noted that "it is contrary to Forest Service policy and direction to permit residency at a site so close to town." *Id.*  Therefore, he required Van Camp to no longer reside on the premises and to remove his trailer and personal effects by February 26, 1999.  Plaintiff was further notified that failure to comply "will result in the suspension of your permit." *Id.*

Van Camp then wrote to Congressman Hayworth, who made an inquiry.  *Exhs. 28-29.*  The Forest Service explained to the congressman that:  permit holders can carry insurance to protect their property; other special use permit holders for marinas that are more remote than Luna Lake do not permanently reside on site; and the presence of a private RV park within a mile of the lake and within view of the lake's entrance.  *Exh. 30.*  Congressman Hayworth forwarded the Forest Services' letter to Plaintiff saying that it was "self-explanatory."   However, Plaintiff's efforts at congressional intervention did result in an agreement to extend the move-out date to March 15, 1999.  *See Exhs. 31, 32.*

Plaintiff wrote Supervisor Bedell, requesting a meeting and asking that Bedell retract his decision "thus, allowing us to return to a reasonable and cooperative relationship." *Exh. 35.*  Yet on March 24, 1999, when Forester Hoffman visited the boat dock to set up the meeting, Plaintiff said that he would not talk the Forest Service without his "advisor" present. *Exh. 36.*  When asked when his advisor could be present, Plaintiff replied that "he had no idea." *Id.*

9

Thus, it appears that a meeting never took place and, by April 8, 1999, Plaintiff was still residing on the premises. On that date, Supervisor Bedell issued a Notice of Noncompliance, indicating that by maintaining year-long residency on the permit area, Van Camp was in violation of paragraph 45 of the permit. Supervisor Bedell cautioned Plaintiff that failure to comply with the terms of the permit is grounds for its revocation under Forest Service regulations. He directed Van Camp to take remedial action by removing his trailer no later than April 23, 1999, and warned him that the Forest Service intended to revoke the permit unless Van Camp complied with the directive by that date. *Exh. 37.*

The following week, Ranger Settles explained to Plaintiff's advisor that the Forest Service wanted Plaintiff to move his trailer rather than revoke the business permit, and if Plaintiff would comply with the deadline, he could still appeal the residency decision without also risking loss of the permit. *Exh. 38.* Van Camp moved the trailer, *Exh. 40,* and pursued an appeal.

### IV.  Administrative Appeal of Decision

Supervisor Bedell denied Plaintiff's request to reverse his decision revoking permission to reside on the premises. In his May 19, 1999 letter, he set forth the following reasons for his denial: (1) the permit does not authorize residency, (2) residency is not necessary because the lake is close to a town where Plaintiff could reside; and (3) Plaintiff's inappropriate conduct while living at the site – specifically, repeated requests to keep personal items separate, allowing friends to consume alcohol at the store (a violation of state law), and shooting the dog (a violation of federal regulations). *Exh. 42.*

Plaintiff appealed, and after reviewing each of Plaintiff's arguments, Appeal Reviewing Officer James Gladen affirmed Bedell's decision. *See Exhs. 43-60.* Reviewing Officer Gladen

10

found that the permit does not authorize on-site residency. *Exh. 60.* Moreover, he determined that past permission to live on-site was within the discretion of the Rangers to grant and modify, but did not constitute "amendments" to the permit. *Id.*

Plaintiff pursued the next level of review by appealing to the Chief of the Forest Service. *See Exhs. 61-64.* Associate Deputy Chief Paul Brouha declined to review Reviewing Officer Gladden's decision. Van Camp was so notified by a letter informing him:

> The review showed that the policy was followed for administering the terms and conditions of the permit and that no prior authorization has been given for permanent residency. It is clear that authorization had been given for seasonal residency; however, continued violation of the terms and conditions to occupy the trailer forced the District Ranger to exercise his discretion to revoke that portion of the permit related to occupancy. This action constitutes the final administrative determination of the Department of Agriculture.

*Exh. 65* (emphasis original).

## V. Analysis

"The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1574 (10th Cir. 1994). In doing so, this Court looks to the reasons stated by the agency for its decision and determines whether the agency's decision it is supported by substantial evidence. *See id.* at 1575.

Plaintiff argues that because the permit lists only a "dock" and "buildings" and because the trailer constitutes a "building" that was on the premises, the permit therefore allows him to reside on the premises at least seasonally or year-round. This ignores the section of the permit that

11

explains the purposes to which the dock and buildings may be put, namely: "[o]perating a high quality boat dock and boat rental service and operating a high quality concession service which would include but not be limited to selling fishing tackle, food, drink, grocery items, and firewood."  The permit itself simply does not address residency much less the terms and conditions of occupancy.

While Plaintiff contends that the decision to revoke permission was arbitrary and capricious because he complied with every condition required by Rangers Walls and Settles, there is substantial evidence in the record to the contrary.  The co-mingling problems persisted after Ranger Walls' letter as customers called to complain and the same types of problems were again discovered during the annual inspection in 1998.  *See Olenhouse,* 42 F.3d at 1575 (substantial evidence means enough to justify refusing to direct a verdict).

Despite the continued problems, Ranger Settles nevertheless agreed to allow Plaintiff to experiment with a winter business to justify his desire to reside year-round.  Within days of that decision, the ranger came upon the folks drinking on the porch who were hostile to the Forest Service.  There is no dispute that Arizona law prohibits open liquor in businesses that do not have liquor licenses.  Shortly thereafter, the dog shooting incident occurred.  There is no dispute that C.F.R. § 261.10(d)(1) prohibits discharging a firearm within 150 yards of a recreational site. Plaintiff's 1977 permission to use a pellet rifle was limited to the removal of beavers or muskrats from the concession area, for which he had the option of trapping them.  Both incidents were in violation of state and federal regulations and, therefore, a breach of paragraph 7 of the permit.

By generously reading the last two administrative decisions, one could construe them as contradictory on the issue of whether the permit was technically "amended" to allow residency.

12

For example, the first decision says that the verbal permission granted Dyson and the written permission given by Rangers Walls and Settles "are not amendments which authorize residency, as required by Clause 45 of the permit." *Exh. 60* at 2. Yet paragraph 45 of the permit says nothing about the mechanics of amendment, it simply says there is no implied permission unless approved by a new permit or by an amendment to the existing permit.[5] Plaintiff argues the permission to reside on the premises must constitute "amendments" to the permit because the final letter advising him Deputy Chief Brouha declined to review Reviewing Officer Gladden's decision says that the "portion of the *permit* related to occupancy" was revoked.

Even if the correspondence regarding residency could be held to constitute a "residency amendment," however, the terms of that amendment were plain from the outset. Van Camp's permit required him to maintain a "quality" business, as opposed to using it as, and having it look like it was, his personal residence. Although Plaintiff displayed continued problems in complying with this condition, the Rangers were willing to give Plaintiff an opportunity to demonstrate that he could bring the area into compliance and to show that winter operations could justify a year-long residency by the permittee.

However, the record demonstrates that Van Camp continued to treat the site as his personal residence as well as violating laws that breached the terms of the permit. The administrative decisions were based on those events. Instead of revoking the permit entirely,

---

[5] Neither the parties or the administrative decisions cite what governs amendment. Under C.F.R. § 251.52 special use permits are to be amended "in such form" as required by the Secretary's regulations and Chief's instructions. Forest Service Manual section 2714 governs special permit amendments. It specifically permits amendments "to effect minor changes in . . . the conditions of occupancy." However, all amendments must be signed by the issuing officer and permit holder and are to be "ma[d]e . . . on form 2700-23."

Plaintiff was permitted to maintain the business provided that he lived elsewhere.  Accordingly, I find the administrative decisions was neither arbitrary nor capricious.

Wherefore,

IT IS HEREBY ORDERED that the agency decision is **sustained** and Plaintiff's complaint be **dismissed with prejudice.**  A final judgment pursuant to Rule 58 shall be entered in favor of Defendant.

                                    _____
                                    UNITED STATES MAGISTRATE JUDGE
                                    Presiding By Consent